NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

STATE OF ARIZONA, *Appellee*,

*v.*

LAURENCE LEE LAWRENCE, *Appellant*.

No. 1 CA-CR 22-0584
FILED 11-02-2023

Appeal from the Superior Court in Maricopa County
No. CR2020-116408-001
The Honorable Scott Sebastian Minder, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Michael O'Toole
*Counsel for Appellee*

Maricopa County Public Defender's Office, Phoenix
By Cory Engle
*Counsel for Appellant*

---

## MEMORANDUM DECISION

Judge Cynthia J. Bailey delivered the decision of the Court, in which Presiding Judge James B. Morse Jr. and Judge Brian Y. Furuya joined.

---

**B A I L E Y**, Judge:

¶1 Laurence Lee Lawrence appeals from his convictions and sentences for second-degree burglary, kidnapping, attempt to commit sexual assault, and sexual assault, arguing the superior court improperly denied his motion for mistrial. We affirm.

## FACTS AND PROCEDURAL HISTORY

¶2 We view the facts in the light most favorable to sustaining the defendant's convictions. *State v. Thompson*, 252 Ariz. 279, 287 n.3 (2022).

¶3 In August 1991, Amanda[1] awoke to a knock at the front door of her Chandler home. Upon opening the door, Lawrence pushed his way in, placed Amanda in a chokehold, and held a gun to her head. He took Amanda upstairs to the main bedroom, where her five-year-old son was sleeping, tied her hands with video game cords, and sexually assaulted her. Lawrence then tied up her ankles and rummaged through different rooms of the house before finding and stealing a small amount of cash. Before he left the house, he pulled the telephone off the bedroom wall and threatened to kill Amanda and her family if she called the police.

¶4 After Lawrence left, Amanda untied her ankles and awoke her son to help her call 911. First responders arrived, untied Amanda's hands, and took her to the hospital. A doctor and nurse collected samples from Amanda for a sexual assault kit, including vaginal swabs and a vaginal aspirate. The doctor and nurse placed each sample in an envelope with a timestamp, Amanda's name, and their signatures. The doctor and case agent signed the sexual assault examination report. Before leaving the hospital, the case agent collected as evidence the sexual assault kit, Amanda's robe, a towel found in the bedroom, and a tape of Amanda's 911 call.

---

[1] We use a pseudonym to protect the victim's identity. *See* Ariz. R. Crim. P. 31.10(f).

¶5 That same day, the case agent impounded the evidence at the Chandler Police Department, storing the sexual assault kit in the department's evidence freezer with a property receipt. At the case agent's request, the police department's evidence technician delivered the sexual assault kit, robe, and towel to the Department of Public Safety ("DPS") laboratory to "check for semen" and "for different hairs."

¶6 In October 1991, the case agent withdrew his testing request after no suspect was identified. The evidence technician retrieved the evidence from DPS in January 1992 and returned it to the Chandler Police Department.

¶7 The evidence remained at the police department until 2014, when another agent re-opened Amanda's case. DNA technology had significantly advanced, and the agent re-submitted the sexual assault kit to the DPS laboratory. Testing revealed that the DNA on the vaginal swabs and vaginal aspirate matched Amanda's DNA profile in the agency's index system, and spermatozoa on the swabs and aspirate matched Lawrence's DNA profile.

¶8 In August 2020, a grand jury indicted Lawrence for burglary in the first degree (count 1), aggravated assault (count 2), kidnapping (counts 3 and 4), attempt to commit sexual assault (count 6), sexual assault (counts 5, 7, and 8), and aggravated assault (count 9). Lawrence pled not guilty to all charges.

¶9 Before trial, Lawrence moved to preclude the DNA evidence from the sexual assault kit and any testimony related to it. Lawrence argued that the State could not establish a chain of custody as the property receipts did not indicate who impounded the kit or where it was stored after DPS returned it to the police in 1992. Lawrence also argued the kit's samples were improperly sealed and therefore the State could not show the samples were in the same condition as when originally collected.

¶10 The State argued the evidence showed a "very clear chain of custody" as the technician's name appeared on the receipt for the DPS testing request, indicating she retrieved the kit from DPS in January 1992 and took it back to the department. The State asserted the paperwork confirmed the kit was exclusively in the possession of DPS or the Chandler Police Department since 1991. And, the State argued, Lawrence presented no evidence that the kit had been tampered with.

¶11 After oral argument, the superior court denied Lawrence's motion, finding "no credible evidence exists to suggest that the samples had

been tampered with," and the "evidence from the Kit's samples were either in the possession of the Chandler Police Department or the DPS crime lab since August of 1991." The court also noted chain of custody concerns usually affect only the weight of the evidence, not its admissibility. *See State v. Morales*, 170 Ariz. 360, 365 (App. 1991).

¶12 On the fifth day of the 11-day jury trial, Lawrence informed the court that the State had just disclosed new chain of custody records from the police department's evidence technician. He sought to preclude the "highly prejudicial" records because they refuted his opening statement claim that the DNA evidence lacked a proper chain of custody. The State's counsel agreed not to introduce the new records, but argued sufficient foundation supported admitting the kit samples.

¶13 On the seventh day of trial, Lawrence orally moved for a mistrial based on the "cumulative effect of multiple developments during the trial." Among other things, Lawrence argued the late-disclosed chain of custody documents damaged his counsel's credibility with the jury because he had asserted in opening statements that such records did not exist. The court denied Lawrence's motion, finding that "[a]lthough the State was obligated to disclose the records, the State had diligently searched, was unaware of them until the [evidence technician's] interview, and was genuinely surprised that the records were available." The court acknowledged the parties' stipulation to preclude the records from use at trial, and "because the discovery of documents affected Mr. Lawrence's defense, the State renewed its prior plea offer to Mr. Lawrence and gave him a week to consider it." The court reasoned that a mistrial was unwarranted as "any prejudice can be cured by other, less dramatic means, such as preclusion of evidence, jury instructions, and the like, to the extent doing so is even necessary."

¶14 At the close of trial, the jury acquitted Lawrence of the aggravated assault counts but found him guilty of the lesser included offense of second-degree burglary (count 1), kidnapping (counts 3 and 4), attempted sexual assault (count 6), and sexual assault (counts 5 and 8). The jury also found aggravating circumstances for his convictions. The court sentenced Lawrence to concurrent terms of imprisonment on counts 3, 4, 5, 6 and 8, the longest of which is 18 years', consecutive to a term of eight years' imprisonment on count 1.

¶15 Lawrence timely appealed, and we have jurisdiction pursuant to Article 6, Section 9, of the Arizona Constitution and A.R.S. §§ 12-120.21(A)(1), 13-4031, and 13-4033(A).

**DISCUSSION**

**¶16**      Lawrence contends the superior court erred in denying his motion for mistrial.  He argues preclusion was an inadequate remedy because the late-disclosed chain of custody records went to the heart of his defense and undermined his credibility with the jury.  Lawrence also argues that Arizona Rules of Criminal Procedure ("Rule") 15.1 requires the State disclose all chain of custody documentation before trial.  *See* Ariz. R. Crim. P. 15.1(b)(3) ("[T]he State must make available to the defendant . . . all existing original and supplemental reports prepared by a law enforcement agency in connection with the charged offense.").

**¶17**      The State argues precluding the evidence properly remedied any late disclosure, and even without the new records, the court had found sufficient chain of custody supported admitting the DNA evidence in its resolution of pre-trial motions.

**¶18**      "Mistrial is an extraordinary remedy for trial error 'and should be granted only when it appears that justice will be thwarted unless the jury is discharged and a new trial granted.'"  *State v. Payne*, 233 Ariz. 484, 504, ¶ 61 (2013) (quoting *State v. Speer*, 221 Ariz. 449, 462, ¶ 72 (2009)).  The superior court is in the best position to determine the appropriate remedy for the mid-trial disclosure based on its assessment of the atmosphere of the trial.  *State v. Bible*, 175 Ariz. 549, 598 (1993).  We will not disturb the court's ruling on a motion for mistrial based on evidentiary concerns absent an abuse of discretion.  *Id.; see also State v. Arvallo*, 232 Ariz. 200, 201, ¶¶ 6–7 (App. 2013).

**¶19**      Lawrence's argument for mistrial rests on his contention that the evidence damaged defense counsel's credibility with the jury.  But the court addressed this issue in its minute entry, noting the parties' agreement to preclude the records from use at trial and the State's renewed plea offer.  *See* Ariz. R. Crim. P. 15.8(d) (stating that reopening a plea offer can avoid the need for additional sanctions from late disclosure of evidence).  The State complied with the parties' preclusion agreement—while defense counsel claimed in his opening statements that the kit "sat somewhere" from January 1992 to October 2014, and "[t]here is no record of it, no chain of custody from that time," the State did not argue otherwise.

**¶20**      The court also noted that "[a]lthough the State was obligated to disclose the records, the State had diligently searched, was unaware of them until the [evidence technician's] interview, and was genuinely surprised that the records were available."  The court concluded the records

"supported the State's position . . . and the State would have benefitted from their disclosure, not their concealment."

**¶21** Before declaring a mistrial, a superior court "must evaluate the situation and decide if some remedy short of mistrial will cure the error." *State v. Adamson*, 136 Ariz. 250, 262 (App. 1983). Here, the court properly exercised its broad discretion in determining the appropriate remedy for the late disclosure. *See State v. Jones*, 197 Ariz. 290, 304, ¶ 32 (2000) (the superior court "is in the best position to determine whether the evidence will actually affect the outcome of the trial"). Nothing in the record suggests that the untimely disclosure required the "most dramatic remedy" of a mistrial. *Adamson*, 136 Ariz. at 262. Lawrence has not shown that justice will be thwarted without the declaration of a mistrial. *See Payne*, 233 Ariz. at 504, ¶ 61. The court did not abuse its discretion.

## CONCLUSION

**¶22** We affirm Lawrence's convictions and sentences.



AMY M. WOOD • Clerk of the Court
FILED:  TM

6